**In re KOOL, MANN, COFFEE & CO. f/d/b/a Moore, Owen, Thomas & Co., debtor.**

**Kool, Mann, Coffee & Co. f/d/b/a Moore, Owen, Thomas & Co., and Thomas O. Moore, debtor and co-plaintiffs,**

**v.**

**L. Coleman Coffey and Robert Bruce Coffey, defendants.**

**Bankruptcy No. 390–00017. Adversary No. 391–0003.**

United States Bankruptcy Court, D. New Jersey.

March 18, 1999.

A. Jeffery Weiss, A.J. Weiss & Associates, St. Thomas, USVI, Denise H. McClelland, Frost & Jacobs, Lexington KY, for debtor and co-plaintiffs, Kool, Mann, Coffee & Co.

Christopher M. Hill, McBrayer, McGinnis, Leslie and Kirkland, Frankfort, KY, Jeffery Posta, Sterns & Weinroth, Trenton, NJ, for creditors and defendants, L. Coleman Coffey and Robert Bruce Coffey.

## OPINION

WILLIAM H. GINDIN, Bankruptcy Judge.

### PROCEDURAL BACKGROUND

This matter involving accounting fraud, comes to the court after an arduous thirteen year procedural history, as a remand from Senior Judge, John P. Fullam, Sitting by Designation in the District Court of the District of the Virgin Islands, Division of St. Thomas and St. John. Judge Fullam vacated the following orders of this court: (i) confirmation order; (ii) decision and findings dated June 9, 1993 estimating the value of the Coffeys' claim pursuant to 11 U.S.C. § 502(c); and (iii) judgment entered September 7, 1993 in adversary proceeding no. 391–0003 regarding the Coffeys' claim. The opinion of Judge Fullam, issued on July 17, 1995 (*"Fullam Opinion"*), was appealed to the Third Circuit and affirmed.

The *Fullam Opinion* directed the bankruptcy court to "reconsider and re-establish an estimated value of the Coffeys' claim, on the basis of the present evidentiary record together with such additional evidence as the parties may present. The adversary proceedings will be remanded

for trial on the merits (or such other disposition as the parties may consent to)." *Fullam Op.* at p. 12.

Subsequent to remand, this court held numerous telephone conferences with counsel for Kool, Mann, Coffee & Co., f/d/b/a Moore, Owen, Thomas & Co. ("debtor") and L. Coleman Coffey and Robert Bruce Coffey (the "Coffeys") to determine the best procedure for claim estimation and trial on the adversary proceeding. The parties agreed to a trial on the papers and have been allowed to present any additional evidence through briefs, affidavits and exhibits. The parties also expressly agreed to waive the right to present further live testimony and to further cross-examine witnesses in this matter. The parties further agreed to include in evidence the entire record developed in the 1992 estimation hearing.[1]

On June 18, 1996 this court entered an order approving the above procedure. The court also ruled that the estimation hearing was subsumed within the trial on

the Coffeys' claim (the trial on the adversary proceeding).[2] The parties have submitted their respective additional findings of fact and conclusions of law, and additional affidavits, memoranda and exhibits. This court has reviewed each of those documents as well as the entire record developed during the 1992 estimation hearings.

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. §§ 157(b)(2)(A), (B) and (O).

## FACTUAL FINDINGS

### History of the Litigation

The facts and history of the transaction between debtor and the Coffeys has been the subject of seven opinions (including three published opinions) by three different judges and panels of the Third and Sixth Circuits. Judge Fullam directed this court to rely on the decisions of the Sixth Circuit, *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439 (6th Cir.1993), and the District Court for the Eastern District

---

1. *See infra* p. 295 – 97 for a discussion of the 1992 estimation hearing.

2. The Coffeys argue that the court ruled that an estimation hearing (to "estimate" the value of the Coffeys' claim) was *dispensed with* or *unnecessary* in violation of the mandate of the *Fullam Opinion*. The Coffeys misconstrue the Fullam order. The Fullam Opinion states that "the adversary proceeding will be tried on the merits, or such other procedure as the bankruptcy court deems necessary." Thus it is abundantly clear that trial on the adversary complaint is warranted and fully sanctioned by Judge Fullam. Furthermore, the *Fullam Opinion* is sufficiently broad to permit a variety of procedural mechanisms. A great part of the initial appeal before Judge Fullam, involved notice to the Coffeys that the value of its claim was being tried in conjunction with the estimation hearing. The Coffeys argued that they had somehow been prejudiced by being unable to put on as complete a defense as they would have, had they known their claim was being tried. (Notwithstanding this argument before the District Court, the Coffeys waived a new trial on remand and agreed to proceed on the papers.) Judge Fullam was thus concerned in his opinion with notice to the Coffeys. In this proceeding, after entry of a case management order explicitly setting

forth the matters to be tried and an exchange of numerous letters and telephone conferences concerning procedure, notice cannot be seriously challenged. The Coffeys also mischaracterize this court's ruling. This court simply ruled that once the trial on the Coffeys' claim was concluded and judgment entered, that was the value of the Coffeys' claim. Thus the estimation hearing (which is a truncated procedure to determine the value of a claim during the pendency of litigation) was *subsumed* within the trial on the adversary proceeding. Although the June 24, 1996 case management order, which was drafted and revised by counsel for both parties (*See letters of Christopher Hill, dated June 12, 1996 and June 17, 1996*), uses the word "unnecessary," the transcripts of the June 7, 1996 case management conference clearly reflect that the court held that the estimation proceeding was "subsumed *within*" the trial. As stated by Mr. Hill, in his letter dated June 12, 1996, "the transcript ... speaks for itself and any attempt to condense it or paraphrase it would be confusing and counter-productive." *June 12, 1996 letter, p. 2.* Finally, logic dictates such a result. The court fails to comprehend the Coffeys' position. Such a course would result in two simultaneous exact duplicate trials to determine the same issue.

of Kentucky, *Moore, Owen, Thomas & Co. v. Coffey,* Civ. No. 87–64 (E.D.Ky.1990) (Hon. Karl S. Forester). The opinion of Judge Forester was reversed by the Sixth Circuit, accordingly, this court will rely on that portion of the district court opinion which was not affected. The Sixth Circuit opinion contains a succinct recitation of the facts which is incorporated by reference here. 992 F.2d at 1441–43.

The transaction at issue in this case is the purchase on December 31, 1985 by debtor of a family-owned marina and houseboat rental business from the original owners, L. Coleman Coffey and his son, Robert Coffey. Shortly after purchasing the business (which will be described below), the parties disputed the assumption of certain debts. By the fall of 1986 the debtor, (known at that time as Moore, Owen & Thomas), "filed suit seeking a declaration as to the assumption of debt issue and a set-off against the purchase price for alleged misrepresentations by the Coffeys." 992 F.2d at 1442. At that time the Coffeys counterclaimed for judgment for the unpaid balance of the note and a declaration stating that debtor has assumed the debts. Simultaneously with the filing of their answer, the Coffeys filed an action in state court suing debtor's principal, Thomas Owen Moore [3], on his guaranty. *Id.* at 1442. The state court action was removed to federal court and consolidated with the action against the corporate debtor before Judge Forester.

Judge Forester bifurcated the issue of assumption of debt from the issues of liability and accounting fraud. Judge Forester ruled on January 31, 1990 that the contract price of the marina/houseboat business was $5,000,000 plus "[debtor] agreed to assume the indebtedness stated in the December 20, 1985 letter ($1.213 million) and is not entitled to a credit for offset against the purchase price owed to the Coffeys for any debts so assumed or

paid." *Id.* (quoting January 31, 1990 opinion of Judge Forester). The Sixth Circuit upheld that opinion of Judge Forester concerning assumption of debt.

Finally, on October 11, 1991 after extensive motions, Judge Forester entered summary judgment against *Thomas Moore, individually,* on two grounds. The first ground was procedural, that *Thomas Moore, individually,* did not file a timely claim for misrepresentation and that *Thomas Moore, individually,* could not "piggy-back" on debtor's timely filed fraud claim. *Id.* at 1443–44. The second ground was that there was no merit to the fraud defense. *Id.* at 1443. The Sixth Circuit reversed on both grounds, articulating that there was an unresolved material issue of fact concerning the misrepresentations by the Coffeys, which if true and if reasonably detrimentally relied upon would be the basis for a set-off. *Id.* at 1446. The Sixth Circuit also held that in order to "determine Moore's [*Thomas Moore, individually* ] obligation on the guaranty agreement, there must first be a finding of the amount of [debtor's] set-offs etc. to determine the amount due on the underlying contract." *Id.* at 1450. The Sixth Circuit remanded the case back to the District Court to conduct a trial on the misrepresentation claims. *Id.*

During the Kentucky litigation, on December 20, 1990, debtor filed a chapter 11 petition in the District of the Virgin Islands. The Coffeys filed a $5 million claim in the debtor's Virgin Islands bankruptcy proceeding. Debtor and Mr. Moore filed an adversary proceeding which asserted accounting fraud, misrepresentation, and sought a set-off of amount due on the note and a judgment for damages against the Coffeys. In addition, a motion for estimation of the Coffeys' claim was filed pursuant to 11 U.S.C. § 502(c). This court conducted five days of trial on January 8, 9, and 16, 1992 and March 5 and 6, 1992, in

---

**3.** It is important to distinguish between the action against Thomas Moore, individually, and the action against the debtor corporation.

This distinction becomes important at different junctures in the case as explained by the Sixth Circuit. *Id.*

the Trenton, New Jersey vicinage by order of Honorable Dolores K. Sloviter, former Chief Judge, United States Court of Appeals for the Third Circuit.

In the interim, Robert Bruce Coffey filed a petition in bankruptcy in the Western District of Kentucky before Hon. Wendell Roberts. Because of the unusual procedural posture and the three courts affected by this proceeding, Judge Forester, Judge Roberts and the undersigned conferred and all three judges determined that the best resolution of the litigation would be for the trial to continue in the Trenton vicinage and to resolve all issues within that trial. This court entered a 29 page opinion in June 9, 1993. That opinion estimated the Coffeys' claim at $26,-915.78. On September 7, 1993 judgment was entered in the adversary proceeding and an order was entered confirming debtor's plan. The opinion and orders were appealed to the district court. Judge Fullam issued an opinion and order on July 31, 1995, which vacated the above orders of this court as well as the opinion and confirmation order. Judge Fullam's opinion was affirmed without opinion by the Third Circuit. In the interim, an opinion was issued declaring that bankruptcy judges have no jurisdiction to hear matters pending in the District of the Virgin Islands. See In re Jaritz Indus., Ltd., 207 B.R. 451 (D.Vi.1997) (Hon. Thomas K. Moore, Chief Judge, United States District Court, District of the Virgin Islands). As a result of that ruling, the disposition of this case was held in abeyance until Chief Judge Moore entered an order on February 27, 1998, directing this court to continue with the remand. The matter is now back before this court on remand, thirteen years after the lawsuit was first brought in Kentucky.

### The Parties and Witnesses

Debtor corporation was formed in 1980 as Moore, Owen, Thomas & Co. It was engaged in the business of constructing and administering tax leveraged lease transactions. The business is exceedingly complex and is essentially a tax shelter arrangement wherein individuals lease equipment to individuals known as users. Through a sophisticated and apparently legitimate borrowing arrangement (described in the original opinion issued by this court), debtor enables its clients to utilize permitted federal income tax incentives and investment tax credits, as well as to take depreciation on the equipment.

Thomas O. Moore is the principal of the debtor, who also ran the operations. Mr. Moore testified at the trial on behalf of the debtor. This court found after witnessing firsthand, the testimony of Mr. Moore, that he was not a very careful businessman who exercised all obligations of due diligence; however, Mr. Moore did do that which was legally required of him. It appeared to this court that Mr. Moore was more concerned with tax gimmicks than the nuts and bolts of the marina business. In addition, Mr. Moore seemed to shade his testimony to present his case in a light most favorable to him. However, the disingenuousness of Mr. Moore's testimony did not rise any where near the level of Mr. Coffey's.

James P. Rolfes is Mr. Moore's certified public accountant who examined the Coffeys' financial statements prior to the closing and advised Mr. Moore about the financial condition of the Coffeys' business. Mr. Rolfes testified at the trial on behalf of debtor. Thomas C. Rink, Esq., an attorney who specializes in tax matters, also testified on behalf of debtor. Charles Atkins, Esq. is Mr. Moore's general tax counsel, who advised debtor about the transaction and was also present at the closing. Mr. Atkins did not testify.

The debtor also offered the testimony of two expert accountants. Robert S. Malinowski, a certified public accountant since 1977 and senior partner at Deloitte & Touche since 1977, testified as to valuation of the business based upon the financial statements presented to the debtor. This court found Mr. Malinowski to be a completely reliable, unbiased, credible and in-

dependent expert. This court also found, based upon the testimony witnessed by this court at trial, that Mr. Malinowski had the motive to tell the truth, and that his logical testimony was not undermined despite extensive cross-examination. Mr. Malinowski also prepared an affidavit which testified as to cash flow in the papers submitted by the debtor in connection with remand.

The other expert who testified on debtor's behalf was Thomas L. Millon. Mr. Millon is a Certified Public Accountant, formerly a senior manager in the Deloitte & Touche Valuation Group and presently a principal with Willamette Management Associates. Mr. Millon specializes in business valuation. Mr. Millon testified in the original trial and again testified by affidavit on remand, as to the cash flow and value of the Coffeys' business.

L. Coleman Coffey testified at trial both as a hostile witness in debtor's case, and as a witness in the Coffeys' case in chief. Mr. Coffey is a certified public accountant, he had experience in the practice of accounting and prior thereto, as an agent for the Internal Revenue Service. This court found after observing extensive testimony and perceiving conduct and demeanor on the stand that Mr. Coffeys' testimony was unreliable. Mr. Coffey exhibited an attitude of unreliability and made numerous contradictions between his testimony at trial and deposition. On many occasions it appeared to the court that Mr. Coffey was "fudging." Mr. Coffey testified at the trial as to cash flow as well as to the specifics of the transaction itself.

The other witness called by the Coffeys at trial was Dr. John H. Davis. Dr. Davis testified to criticize Mr. Millon's valuation. Dr. Davis did not offer any independent analysis of the cash flow or value of the Coffeys' business. On remand, the Coffeys offered the opinion by affidavit, of an expert witness, James E. Graves as to cash flow and valuation. Mr. Graves is an Accredited Senior Appraiser (ASA Designation) and Chartered Financial Analyst (CFA Designation), and Vice President of Mercer Capital Management, Inc., a business valuation firm. As will be discussed below, the opinion of the Coffeys' own expert arrives at essentially the *same value for cash flow as debtor's experts*.

### The Marina/Houseboat Acquisition

In early November 1985 the Coffeys and Mr. Moore began negotiations for the purchase of the Coffeys' marina and houseboat operation. The business was known as Lake Cumberland State Dock Incorporated ("LCSDI"). *Moore, Owen Thomas & Co. v. Coffey,* 992 F.2d 1439, 1441 (6th Cir.1993). At that time the business, which was located in Lake Cumberland State Park, Kentucky, possessed the largest houseboat fleet on the East Coast and also owned several automobiles, trucks, boat motors, and other marina equipment. *Id.* The marina also consisted of docks and slips and a retail store. The houseboats were owned by Vacation Cruises, a partnership owned by both Coffeys. Vacation Cruises rented the houseboats to LCSDI. All other assets were owned by LCSDI. *Id.* LCSDI operated the marina pursuant to a license issued by the Kentucky Department of Parks which, in turn, leased the property from the United States Army Corps of Engineers. *Gindin Opinion* at 7.

On December 11, 1985, the parties first met to discuss an acquisition of the business. 992 F.2d at 1442. The meeting took place at Mr. Coffey's Frankfort, Kentucky accounting office. At this meeting in Mr. Coffey's accounting office, Mr. Moore was given a copy of LCSDI's unaudited financial statements as of September 30, 1985. *Gindin Op.* at 10. This court found that Mr. Coffey represented to Mr. Moore that the books and records were kept on a cash basis. *Id.* at 11. In addition, this court found that Mr. Coffey represented to Mr. Moore, during negotiations and prior to the December 31, 1985 closing, that annual cash flow for the marina business was between $500,000 and $600,000. The evidence concerning this representation about cash flow is substantial and uncontrovert-

ed. In fact, Mr. Coffey admitted on four different occasions under oath, that he had represented cash flow to be in excess of $500,000. *See Tr. of Testimony of L. Coleman Coffey, Aug. 8, 1991, Tr. of Testimony of L. Coleman Coffey, Jan. 8, 1992, Tr. of Testimony of L. Coleman Coffey, March 4, 1992, Tr. of Testimony of L. Coleman Coffey, Nov. 17, 1992.* Mr. Moore testified that he relied on this representation about cash flow in arriving at a purchase price of $5,000,000. Mr. Moore determined that the sole source of money to pay a note to the Coffeys would be from cash flow of the business. *Tr. of Testimony of Mr. Moore, Nov. 18, 1992.* Mr. Moore calculated that in order to service the acquisition debt associated with a $5,000,000 purchase price, that $550,000 annual cash flow would be required. *Id. See also Flow charts attached to Affidavit of Thomas Moore, dated July 13, 1997.* Since Mr. Coffey represented that cash flow was in excess of $500,000, Mr. Moore determined that the $5,000,000 purchase price was justified. *Id.*

An agreement in principal was reached wherein the Coffeys would sell the stock of the company, including the houseboats owned by Vacation Cruises to debtor for $5,000,000. In addition, debtor would assume "LCSDI's debt of $1.2 [sic][4] million to three regional banks." *Forester Op.* at 9. The Coffeys agreed to finance the purchase price (a promissory note on an installment basis) provided that Mr. Moore personally guarantee the note. 992 F.2d at 1442. In order to realize specific tax advantages which were the basis for the acquisition, the closing had to take place within twenty days, on or before December 31, 1985. *Gindin Opinion at 12.*

The next meeting occurred on December 14, 1985. At that meeting Mr. Rolfes, debtor's accountant, met with Mr. Smith, a partner at L. Coleman Coffey's accounting

firm. At that meeting, Mr. Rolfes was given the same September 30, 1985 financial statements, a profit and loss statement and other documents which were represented to be prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). *Gindin Op.* at 11. Based upon those documents Mr. Rolfes concluded that the business had a cash flow of $580,000 which would support a $5,000,000 purchase price. *Id.* Mr. Moore relied on this determination of cash flow based upon the financial statements, in going forward with the closing. *See Tr. of Testimony of Thomas Moore, Nov. 18, 1992; Affidavit of Thomas Moore, March, 1996.*

A third meeting occurred on December 21, 1985 at the offices of debtor's counsel, Charles Atkins, Esq. Mr. Moore, Mr. Atkins and Mr. Coffey attended the meeting and discussed tax strategy to avoid depreciation recapture. *Forester Opinion* at 8. After this meeting Mr. Coffey determined that the strategy would work and "agreed that any tax savings approved by the IRS would be passed along to [debtor] as a reduction in the purchase price." *Forester Findings of Fact and Conclusions of Law, dated January 31, 1990* at p. 4.

The closing occurred on December 31, 1985, again at the accounting firm of Mr. Coffey. In attendance were Mr. Moore, Mr. Atkins, Robert Bruce Coffey and David Smith, Esq. (Coffeys' counsel). L. Coleman Coffey was in Florida at the time and participated by telephone. *Forester Op.* at 8. At the closing, the Coffeys presented financial statements dated November 30, 1985. These statements were presented for the first time at the closing. *Gindin Op.* at 14. The November 1985 financial statements were incorporated into the agreement as Schedule B. 992 F.2d 1439.

In addition, a letter dated December 20, 1985 was presented at the closing. Judge

---

4. The 6th Circuit opinion, 992 F.2d at 1442, and the Findings of Fact of J. Forester dated 1/31/90 at p. 5 both state that the indebtedness to the regional banks was $1.213 million.

The Opinion of J. Forester dated 10/11/91 states that the debt was $1.2 million. This court concludes that the correct figure is $1.213 million.

Forester found that the purpose of this letter was to function as Schedule A to the purchase agreement as a list of indebtedness which the debtor was to assume. *J. Forester's Findings of Fact and Conclusions of Law* at p. 10–13. The December 20, 1985 letter contained language that "the financial statements are reasonably accurate except for the houseboat transactions. These amounts will wash out and show a small profit for the Corporation." *Gindin Op.* at 13; *Fullam Op.* at 10.[5] An additional document presented at the closing was a side-letter which gave debtor the benefits of "any tax savings eventually achieved." *Id.* at 9.

Finally, the purchase agreement was also completed and executed at the closing. The contract contained a representation in paragraph 5(e), that

[T]he financial statements as of November 30, 1985, ... prepared by the Corporation, which are presently being audited by Dudley Shyrock, Certified Public Accountant ... *are complete and correct and fairly represent the financial condition of the Corporation as of the date thereof* and the results of its operation for the twelve month period on the date accept as noted, discussed and agreed by the parties and evidenced by a letter to Tom Moore of December 20, 1985, which is hereto attached and herein incorporated, *such statements having been prepared in conformity with generally accepted accounting principles consistently followed throughout the period indicated* ... (emphasis added).

Dudley Shyrock, the Coffeys' own accountant, later testified that the same financial statements overstated the assets of the corporation in the amount of $300,000. 992 F.2d at 1444.

The Coffeys often refer to handwritten notations on the schedules to the purchase agreement, however, as found by Judge Forester, "these notations were not placed on the documents until after closing. This is consistent with the testimony of all witnesses at the closing that no marks were physically placed on the schedules on December 31, 1985." *Forester Findings of Fact and Conclusions of Law* at 12.

### The Misrepresentations

Subsequent to closing, debtor had the ability to perform a full audit and discovered the misrepresentations. Litigation and a fraud action commenced soon thereafter. Debtor asserts that the Coffeys committed six actionable misrepresentations. Those representations as found by the Sixth Circuit are as follows:

"(1) The purchase and sale agreement, paragraph 5(e), provides that financial statements of November 30, 1985, incorporated into the agreement as Schedule B and prepared by accountant Dudley Shyrock, are complete and correct and fairly represent the financial condition of the Corporation as of the date thereof and ... such statements have been prepared in conformity with generally accepted accounting principles...." However, accountant Shyrock testified that the same financial statement overstated the assets of the corporation in the amount of $300,000.

(2) The purchase and sale agreement, paragraph 5(k), states that the culmination of the transactions provided for shall not result in a default under or cancellation or termination of any continuing agreements, contracts, etc. According to Moore, the Coffeys stated during the negotiations for the sale of the marina business that they intended to contribute the Vacation Cruises houseboats to the capital of LCSDI. Several banks had financed the (Coffeys') purchase of the houseboats and these banks all held security interests in the houseboats. Following the sale, the

**5.** Although Judge Fullam's opinion states that the December 20, 1985 letter states that the financial statements are "generally accurate" a review of the letter shows that it states they are "reasonably accurate."

banks did, in fact, declare that the transfer of the ownership of the houseboats, from Vacation Cruises to MOT, constituted a default under the security agreements.

(3) The alleged misrepresentations specifically set forth in Moore's affidavit.[6]

992 F.2d at 1444.

The Sixth Circuit found that if found to be true by a fact-finder, the first allegation concerning misrepresentations contained in the financial statements would form the basis for an action for fraud. *Id.*[7] In addition, the Sixth Circuit found that the other misrepresentations, although concerning events which were to occur in the future, likewise could form the basis for a fraud action if they were stated positively in order to induce Mr. Moore into consummating the transaction. *Id.* at 1447–48. Accordingly, the Sixth Circuit reversed Judge Forester's granting of summary judgment. *Id.*

After trial, this court found that the Coffey's made the following misrepresentations to Mr. Moore, prior to his acquisition of the marina business:

*September 30, 1985 Financials*

1. Mr. Coffey represented to Mr. Moore that the books and records were kept on a "cash" basis, however, the September 30, 1985 financial statement was put together by some combination of cash and accrual accounting.

2. The item "Notes Receivable" should have been listed under "Sales."

3. "Houseboats Available for Resale" were, in fact, boats which had been sold prior to closing and should not have appeared as assets.

4. The statements listed accounts showing the sale of houseboats, but there was no deduction from the account of "Houseboats Available for Resale." This caused the resultant profit in the profit and loss statement to be misleading.

*November 30, 1985 Financials*

1. This statement mis-stated profits and income, as well as assets. It was prepared in a completely unacceptable and misleading manner.

2. The recordation of houseboat transactions in the fall of 1985 between the September 30, 1985 statement and the November 30, 1985 statement were set forth in a manner different from any that had ever been used before. For example, "Houseboats for Resale," "Notes Receivable" and the like, were so

---

**6.** The six misrepresentations contained in Mr. Moore's affidavit referred to by the Sixth Circuit are as follows: (a) The Coffeys represented that they had obtained or could easily obtain all necessary approvals from local, state, and federal authorities for the expansion of the marina business; (b) The Coffeys displayed materials and supplies to Moore and represented that they were purchased for an expansion of the marina business to commence in the Spring of 1986; (c) The Coffeys represented that an agreement was "all but done" by which the Commonwealth of Kentucky Department of Parks would reduce and stabilize the fees paid by the owner of the marina business to the Commonwealth of Kentucky; (d) The Coffeys represented that subsequent to the purchase of the marina business, the purchaser could easily obtain an extension of the lease and license with the Commonwealth, which instruments were necessary to the operation of the marina business; (e) The Coffeys represented that they had disclosed to Moore all liabilities of the corporation; and (f) The Coffeys gave Moore certain financial statements which they represented were prepared in accord with generally accepted accounting principles and which statements were represented to accurately state the operating income, assets and liabilities of the corporation. 992 F.2d at 1443.

**7.** The Sixth Circuit also explicitly rejected the Coffey's argument that the fraud claim was not actionable because Mr. Moore was represented by an accountant and tax attorney. 992 F.2d at 1447. The Sixth Circuit found that if the falsehoods contained in the financials were such that they could not have been discovered through ordinary diligence, and Mr. Moore detrimentally relied on those financials, then an action for fraud could be maintained notwithstanding the presence of the experts. *Id.*

misleading as to have made it impossible for a reasonably prudent purchaser to understand the true state of the business being purchased but rather, would have to believe that it had a much greater value than it actually did.

3. Furthermore, amounts listed as values for houseboats exceed their actual cost. While there are times when personal property increases in value, the facts in the within matter make it clear that this is simply not the case. This court found as a matter of fact that Mr. Coffey's excuse that the purchase of aluminum increased the value of the houseboats, was untrue. Further, the court found that his failure to disclose such pricing manipulations and costs was unacceptable. It was thus improper for him to list the property on the books of business in the manner in which he did.

*Gindin Op.* at 12–15.

### Conclusion on Remand as to Misrepresentations

After reviewing all of the original trial material and the new evidence submitted at this trial, and following Judge Fullam's instructions to list more specifically the dollar value of the misrepresentations, this court has determined the following misrepresentations were made:

1. Overvaluation of value of 33 houseboats by $10,000 each for a total of $330,000. *See 1992 Proceedings Exhibit D9 and 11/17/92 pp. 113–116.*

2. Listing in 11/30/85 financials, $429,607 as the Value of Houseboats in inventory when those boats did not exist as they had already been sold. *See 11/30/85 financials; JA 389–390.*[8]

3. Listing in 11/85 financials, $40,190 as the Value of Motors in inventory

when those motors did not exist. *See 11/30/85 financials; JA 389–390.*

4. Overstatement of profits by $100,000 in 11/30/85 financials as a result of incorrectly recording the sale and purchase of motors. *See JA393–498.*

5. Representation that the purchase of new houseboats and sale of old houseboats would "wash" or show a profit when the transaction actually resulted in a loss of $168,500. *See J.A. 475–76.*

6. Disclosure in Graves Report that Costs of Sale in the amount of $58,000 were omitted from the financials.

7. L. Coleman Coffey testified that he represented prior to closing that the cash flow of the business was in excess of $500,000 when it actually was only $188,848. *See supra* p. 10.

There are additional misrepresentations which have an impact on value, breach the warranty that the financial statements were prepared in accordance with GAAP, that the procedures of accounting followed previous used methods of evaluation, and that the net income represents operating income from the normal course of business and does not include items of nonrecurring income. These misrepresentations form the basis for fraud, and breach of contract in that they create the misleading impression that the business was more profitable than it actually was. These misrepresentations, however, do not contain exact dollar amounts:

1. Mr. Coffey warranted that the Financial Statements were kept in accordance with GAAP; however, he later conceded that the financial statements were not kept in accordance with GAAP, were misleading and materially incorrect. *See Contract of Sale par. 5(e) and J.A. 376–77; 470.*

8. For brevity and clarity, this court will refer to the appellate designation ("J.A.") of certain

evidence. *See Brief of Debtor and exhibits thereto.*

2. The 11/30/85 financial statements violated GAAP Financial Accounting Standard No. 57 because no disclosure was made of certain intercompany transactions between Vacation Cruises and LCSDI. *See J.A., 111.* (For example, LCSDI sold 11 new houseboats to Vacation Cruises but listed them as an ordinary sale and not an intercompany transaction.) (This particular misrepresentation was characterized by an expert accountant as a "total misstatement of GAAP." *See Testimony of Robert Malinowski, J.A. 114.*)

3. The 11/30/85 Financial Statements included a credit made to the account "Notes Receivables" when that transaction was actually a sale of substantial assets. *See J.A. 383–84.*

4. Sale of houseboats to third parties was reported to the account "Sale of Houseboats," but there was no corresponding decrease from the account "Houseboats for Resale." This overstated the assets of the business. *See J.A. 403.*

5. Breach of the Representation that there were no changes in accounting methodology, when Mr. Coffey testified that he changed the way LCSDI recorded houseboat transactions from the 9/30/85 Financials to the 11/30/85 Financials. *See J.A. 399–400.*

6. Mr. Coffey testified that he breached the representation that the financial statements "do not include any items of non-recurring income or special items of income . . ." *See J.A. 405–06.*

7. Mr. Coffey testified that all of the information concerning the overstatements, errors and changes in accounting methodology was available to him prior to the closing. *See J.A. 394.* Thus Mr. Coffey could have provided the information before the debtor executed the $5 million note and commenced payments. Instead Mr. Coffey waited until the company was audited the following spring of 1986 to disclose the information to the auditor.

*The December 20, 1985 Letter*

The Coffeys place great emphasis on a phrase in the letter of December 20, 1985, as somehow remedying or explaining all of the above referenced misrepresentations and overstatements of value. As stated above, the letter of December 20, 1985, gave information concerning the notes payable from December boat transactions and a statement that "the financial statements are reasonably accurate except for the houseboat transactions. These amounts will wash out and show a small profit for the Corporation." *Letter dated 12/20/85.* As held by Judge Forester, the purpose of this letter was simply to function as Schedule A to the purchase agreement as a list of indebtedness which the debtor was to assume. *J. Forester's Findings of Fact and Conclusions of Law* at p. 10–13. Notwithstanding such ruling, and the plain language of the statement, the Coffeys argue that this letter functions as notice of the misrepresentations and deviations from GAAP, thereby relieving them of their fraud and from liability for breach of the representations and warranties contained in the contract.

In its original opinion, this court found, that with the exception of the "wash," Mr. Moore and the debtor had every right to rely upon the financial statements of September 30, 1985 and November 30, 1995, because the plain language of the December 20, 1985 letter in no way gave any suggestion or evidence that the financial statements deviated from GAAP principles of accounting methodology or overstated assets and income and understated liabilities. *Gindin Op. at 14.* The implication of the statement "wash" is that if there are slight immaterial inaccuracies in the reporting of the sales, that there would be no net effect on income and profit of the

corporation. In fact, the letter states that a small profit will be shown after remedying the minor inaccuracies in the houseboat transactions. The sales did not "wash" and show a small profit, however; rather the evidence shows that the company lost money maintaining the houseboat fleet.

This court further found that the statement "wash" itself was misleading. For instance, a comparison of the "Sale of Houseboats" figure in the November 30, 1985 statement of $391,695 as being a wash does not and cannot explain the fact that it should not have appeared under "Income" at all. In addition, this court finds as a matter of fact, the sales of the houseboats did not constitute a "wash" because the purchase of new houseboats were not equivalent to the sale of old boats. For example, in 1985 the business purchased ten new houseboats for $335,-000, but according to the audited financial statements sold eleven old houseboats for only $182,500. Thus in one year alone (1985), the company lost $168,500 in maintaining the houseboat fleet rather than breaking even or showing "a small profit."

Even if it were true that the houseboat transactions did constitute a "wash," the letter still did not give notice of Mr. Coffey's other misrepresentations such as the deviations from GAAP, and other misrepresentations of cash flow. Thus, this court finds, after a review of the submissions and the new evidence, the statement was false in that the sales of houseboats did not constitute a "wash," and the letter was intended to and did function, exactly in the manner as found by Judge Forrester, namely as Schedule A, a list of assumed indebtedness. Furthermore, since the statement that the houseboats would show a profit was false, rather than relieving the Coffey's from liability for their fraud, it constituted a separate and distinct misrepresentation in and of itself.

**9.** The *Valuing a Business* textbook is cited as a resource for valuation by both the Federal Judicial Center and The American Institute of

## Misrepresentations' Effect on Value/Cause of Injury

Judge Fullam directed this court on remand to make further factual findings which explain the causal relationship between the mis-statements on the financial statements and the damages. In other words, this court is to describe how $300,-000 in overstatement of assets (among other misrepresentations) causes a party to pay $2.5 million too much for the business. This topic was greatly disputed in the recent certifications of experts and briefs submitted by both the debtor and the Coffeys.

In trying to defend their misrepresentations, the Coffeys make much ado about the use of projections and profess a lack of understanding of the relationship between false statements about a company on financials and the value of the company. This argument demonstrates a misunderstanding of business valuation which depends upon accurate reporting of cash flow. (*See Valuing a Business,* Shannon Pratt; DOW-JONES-IRWIN, 1981 )[9]. "[T]he misreporting of an accounting method can greatly impact the reported earnings thereby distorting the value of the company." (*Id.* at 176–77). Thus, the method to determine the value of a company depends upon the accuracy of information received. *Id.* at 51. The Coffeys fail to cite a single valid source for its position that this court may not take into consideration any projections of cash flow, or that misrepresentation of cash flow does not effect value. In fact, to the contrary, "[t]here is widespread consensus that capitalization of cash flow is the most important single fact in valuation of most operating companies, such as manufacturers, merchandisers, and companies providing various services." *Valuing a Business* at p. 56. Furthermore, even historical analyses rely on some assumptions or projections. ("Most business valuations wind up relying on his-

Certified Public Accountants. *See Financial Statements in the Courtroom,* p. 89.

torical data, which are evaluated to reflect reasonable expectations about foreseeable future changes.") *Id.* at p. 29. *See also Handbook of Business Valuation,* Thomas L. West and Jeffrey D. Jones, JOHN WILEY & SONS, INC., 1992, p. 183 (same).

The Coffeys advocate an approach to value which assumes that the value of the business to the debtor is merely its assets. If that were true, however, then the debtor would have simply tallied up the inventory of the houseboat business less the liabilities and paid a fraction of the $5 million purchase price. The $5 million purchase price could only be justified if the debtor were anticipating that the business would produce revenue in the future that has a value which exceeds the sum of its assets. *See supra* pp. 303 – 04. In fact, in most acquisition scenarios, "[p]eople tend to think in terms of income to replace their paycheck. They look at the total discretionary earnings to see if it is sufficient to pay all the operating expenses, carry the debt structure and provide a livable wage." *Handbook of Business Valuation* at 197. Such widely recognized approach "considers a business or other income producing property more or less as though it were a money machine whose purpose is to produce money for its owner." *Id.* at 180. (*See also Valuing a Business,* "the value of an interest in a business is dependent on the future benefits that will accrue to that interest." *Id.* at 29; *Financial Statements in the Courtroom,* FEDERAL JUDICIAL CENTER AND THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, p. 87. "The value of an asset can be estimated as a function of the anticipated receipt of future benefits." *Id.*).

The financial statements of the business are the primary tool which purchasers use to determine cash flow, which indicates the financial health of the company. When an accountant doctors the financials, that person has in essence, eliminated the only way in which the professional can evaluate the business. "To the extent that the financial statements are prepared on some

basis differing from GAAP, such differences need to be explained and usually adjusted to conform to GAAP presentations." *Valuing a Business,* at 85. Otherwise, the use of different accounting methods may yield very different results in earnings or value. *Id.* at 176–77. "Where the accounting used is not in accordance with GAAP, the figures do not fairly present the financial position of the company, and the financials should be qualified to state such deviation." *Id.* at 184. No matter who loud the Coffeys protest, they cannot escape the fact that they made misrepresentations on the financials and deviated from GAAP without disclosing such fact. This has been admitted by their own expert, found by the Sixth Circuit and is the law of the case. Nor can the Coffeys avoid the fact that their own expert has arrived at the same value for the actual cash flow as the debtor's expert. Thus it is clear and beyond dispute that the Coffeys made misrepresentations on the financials and that actual cash flow was far below the promised $500,000 sum.

There is an additional, but related, reason that the overstatement of houseboat assets had a devastating effect on value. The assets which were overstated were *inventory assets.* The houseboats were the heart of the business and determined in large part what the profit would be because they were re-occurring assets. The misrepresentations were not in non-inventory assets, such as office furniture, which might warrant a dollar-for-dollar reduction for damages. Rather, the misrepresentation was in inventory assets, which drives the subject business and contributes to the bottom line in terms of profitability and cash flow. In fact this distinction is so important to these types of transactions, that the Contract of Sale for the purchase of the houseboat/marina business warranted that the financial information set forth in the financials represented operating income from the *normal course of business* and not "*non-reoccurring income* or special items income ..." *Contract of Sale*

par. 5(e) (emphasis added). Thus, the overstatement of inventory assets as well as the other misrepresentations caused the business to be overvalued by approximately $2.7 million dollars as will be discussed below.[10]

The Coffey's lengthy discussion and extreme hyperbole about the entire analysis of Mr. Millon being reduced to the question of costs of 9 new house boats versus 7 old houseboats is nothing more than a smokescreen. The misrepresentation in the costs of houseboats has been proved as a matter of fact, is beyond dispute, and has been acknowledged, in Judge Fullam's opinion and in the opinion of the Sixth Circuit. Second, the $330,000 houseboat misrepresentation is only one of numerous actionable misrepresentations articulated by this court *see supra* p. 301, as well as the Sixth Circuit. Mr. Millon was charged by this court and Judge Fullam's opinion to prove the impact that such misrepresentations would have upon an individual in determining the value of such a business. In other words, how would that accounting fraud inflate the price that a person would be willing to pay for a company if all that the Coffeys had represented, were actually true. Mr. Millon's example of the 9 new houseboats versus 7 old houseboats, was only an example, and this court agrees that any number could be plugged into the formula. Furthermore, Mr. Millon offered this court a variety of calculations demonstrating the effect of the misrepresentations upon value.

Of most importance, ultimately this court must rely on the multiple of cash flow methodology as is discussed below; therefore, it need not utilize the 9 new houseboat versus 7 old houseboat hypothetical to demonstrate causation. Thus the whole discussion becomes moot.

**Damages/Valuation of the Property**

Judge Fullam indicated that since the debtor's setoff claims were for damages, not recission of the contract, this court must determine the amount of damages on remand. *Fullam Op.* at 9. Judge Fullam indicated that:

> [T]he correct measure of damages, as recognized by the bankruptcy judge, is the difference between the fair market value of the purchased stock if the information supplied by the Coffeys had been correct (here presumably, the $5 million price the parties agreed upon) and the true fair market value of the stock, in light of the asserted misrepresentations, inaccuracies and deficiencies.

*Fullam Op.* at 9.

Judge Fullam felt that this court did not make specific findings as to fair market value, *Id.*, and thus there was insufficient evidence in the original opinion of this court to establish damages. *Id.* at 11. This court was directed to do so on remand. In so doing, Judge Fullam expressed discomfort with the use of hypothetical projections and requested that on remand more historical data be used in calculating cash flow and value. *Fullam Op.* at 10–11. Accordingly, this court will use the multiple of cash flow methodology in determining the value of the business in 1985. In addition, this court will not allow the debtor credits for payments on account of indebtedness or for any tax savings. *See Fullam Op.* at 11–12. The measure of damages will be the difference between the $5 million purchase price [11] and the fair

---

10. In its original opinion, this court only ascribed dollar amounts to one of the individual misrepresentations ($330,000 overvaluation of houseboats) because the ultimate task in determining damages is to value the company not to tally up the individual misrepresentations. (*See Fullam Op.* at 9: the measure of damages is the difference between the $5 million purchase price and the true fair market value of the stock). Thus while the misrepresentations have the effect of reducing cash flow, the calculation is more complicated than a dollar-for-dollar deduction. It should be noted, however, that on remand, the dollar value of the quantified misrepresentations is $1,487,449.

11. Judge Fullam indicated that the fair market value of the stock if the information supplied by the Coffeys had been correct was

market value of the business according to the multiple of cash flow methodology.

The first step in conducting the multiple cash flow methodology is to arrive at a figure for actual cash flow for the year in which the business was purchased. Both the experts for debtor and the Coffeys submitted evaluations of cash flow.

*Coffeys' Calculation of Cash Flow for 1985*

James E. Graves, the Coffeys' expert, determined the free cash flow for 1985 for the combined marina/houseboat business. The report was based upon information supplied by Coleman Coffey to Mr. Graves. In the course of such consultation, Mr. Coffey revealed to Mr. Graves two additional misrepresentations which were previously undisclosed. The first misrepresentation was an omission of $29,000 costs of sale for a World's Fair 46 foot 1982 model boat. *Graves Report Exhibit I, p. 2.* The debtor concedes that this misrepresentation did not have a significant impact on cash flow. *Brief of Debtor* p. 5. The second misrepresentation was an under-reporting of 1985 costs of motors by $58,000. Accordingly, costs of sale should be reduced an additional $58,000 based upon new information submitted in the Graves Report. The Graves Report states that those adjustments "had the impact of reducing pretax income and thereby cash flow." *Graves Report,* p. 2. The

Graves Report also included in calculation of cash flow, the net increase in long term debt of $173,000. *Graves Report, Exhibit I,* p. 4. The Graves Report, however, qualifies the inclusion of such long term debt by stating that: "An unusually large capital expenditure in a given year could result in negative cash flow, while changes in net borrowings would have a similar impact. Accordingly, Free Cash Flow in one year should not necessarily be assumed to be available at such levels in future years." *Graves Report,* p. 2. The Graves Report also used an income tax rate of 46 percent. Mr. Graves determined a free cash flow for 1985 to be $352,585. After deducting the $173,000 in long term debt,[12] to bring the calculation to a true debt-free cash flow, Mr. Graves' cash flow for 1985 is $179,585.

*The Debtor's Calculation of Cash Flow*

Debtor's expert Robert Malinowski, submitted a calculation of cash flow during the original trial of $246,848. This court found that determination to be accurate, true and correct. In this trial, Mr. Malinowski submitted an affidavit which determined free cash flow for 1985 and took into consideration the newly disclosed misrepresentations in costs of sale which were indicated in the Graves Report. *Robert Malinowski Affidavit,* p. 2. Mr. Malinowski found actual free cash flow for 1985 to be $188,848.

"presumably" the $5 million price upon which the parties agreed. *Fullam Op.* at 9. Although that is not technically a definitive holding, by use of the word "presumably," this court is deferring to Judge Fullam's identification of value.

**12.** This court agrees with debtor's expert, Mr. Millon, that long term debt does not belong in a determination of free cash flow for purposes of valuing a business for two reasons. First, the use of long term debt distorts earnings. (*See Valuing a Business,* Shannon Pratt; Dow-Jones-Irwin, 1981. "The comparison of the market value to earning power among two or more companies that have significantly different degrees of financial leverage can be more meaningful if the prices and the earnings for the companies being compared are all adjusted to a debt-free basis. This makes the ratios more comparative in the sense that distor-

tions might be introduced as the result of differences in financial leverage are alleviated." *Id.* at 64.)

Second, long term debt does not represent an ongoing earning power which is what a purchaser bargains for. *See Valuing a Business* at 171. "In analyzing a company's historical earnings ... the analyst should make every reasonable effort to distinguish between those past earnings which are representative of an ongoing earning power and those which are not. The analyst should make adjustments to the income statements to eliminate the effect of past items that would tend to distort a reasonable representation of the company's current and future earning power." *Id. See also Handbook of Business Valuation,* Thomas L. West and Jeffrey D. Jones, John Wiley & Sons, Inc, 1992, p. 183.

The court notes that this determination is within $9,000 of the determination of the Coffeys' expert report when adjusted to a debt free model. It is compelling that both experts arrive at essentially the same figure for cash flow. The Coffeys' do not dispute the accuracy of Mr. Malinowski's determination of cash flow, nor did Judge Fullam find flaws in that calculation. For the reasons set forth in this court's original opinion, this court finds Mr. Malinowski's calculation of free cash flow to be true and correct. In addition, this court finds it appropriate to include the deduction for the additional misrepresentation in costs of sale, because as indicated the by the Coffeys' expert, such misrepresentation has the effect of overstating income and profit. Accordingly, this court finds that the free cash flow for 1985 is $188,848.

*Debtor's Determination of Fair Market Value*

The debtor's expert, Thomas Millon, submitted a report which offered alternative methodologies for determining fair market value of the marina/houseboat business in 1985. The first methodology, discounted cash flow analysis is one of the most widely accepted methods for valuation of closely held businesses. However, since this methodology relies heavily upon the use of projections and hypotheticals, which Judge Fullam criticized, this court has declined to rely on those calculations. Accordingly, all of the Coffeys' arguments relating to the discounted cash flow analysis of Mr. Millon, and his models and hypotheticals are moot.

Instead, this court has chosen to rely on the alternative methodology used by Mr. Millon, the multiple of cash flow analysis. The multiple of cash flow analysis is a straightforward calculation which relies on historical data, namely actual cash flow, and applies a growth rate, discount rate and tax rate to arrive at a present value for cash flow. *Handbook of Business Val-*uation at 188. Then an appropriate multiple (number of years) is selected. The adjusted cash flow for each year is added for a sum of present value of cash flow. *Id.* The Coffeys did not contest the multiple of cash flow calculation at all, nor did they challenge a single factor used by such analysis. Instead, the Coffeys concentrated exclusively on arguing against the discounted cash flow analysis of Mr. Millon.

Mr. Millon selected an initial tax rate of 46% for the first tax year and then a tax rate of 40% for the remaining tax years of the term. This number was not challenged by the Coffeys, and in fact, is identical to the tax rate selected by the Coffeys' expert, Mr. Graves. (*See also Valuing a Business* at 65). Mr. Millon used a growth rate of 7.5%, again which was unchallenged.

Mr. Millon also selected a discount rate (or present value factor) of 18.5%. During the initial trial, there was some cross-examination on the discount rate employed by Mr. Millon in his discounted cash flow analysis. However, the court notes that in this trial, the Coffeys' own expert, selected a discount rate of 20% when calculating the present value of a promissory note issued by the debtor. The Coffeys' expert justified this rate by the risk associated with the lack of marketability of such debt and the diminished creditworthiness in comparison to various national rates.[13] The discount relates to the "degree of risk that the future benefits bargained for by the investor will or will not be attained. The riskier the enterprise ... the more return the investor will demand to compensate for the greater chance that the business will not perform as expected." *Valuing a Business* at 37. "A discount rate is derived from a variety of factors. In addition to data concerning the general economic climate, an appraiser must consider ... factors specific to the business to be acquired and derive a weighted aver-

---

13. Although the Graves was determining the present value of a note and not the present value of cash flow, the determination is applicable in that the note represents debt incurred in connection with the acquisition of the business.

age." *Handbook of Business Valuation,* 184–85. "The final elected multiplier will be based upon the appraiser's review of the subjective and objective risks and economic factors pertaining to the company." *Id.* As a rule of thumb, "[b]usinesses in a highly competitive industry that require little capital to enter and no management depth, and where the element of risk is high although the past record may be good" generally warrant between a 16% – 20% discount rate. Thus this court finds the 18.5% rate reasonable for the reasons related to risk and creditworthiness asserted by Mr. Graves in his report.

Finally, Mr. Millon chose a 15 year multiple. This figure similarly was uncontested. Mr. Millon justified the choice of 15 years, in that the debtor was purchasing a business with a 15 year lease. The court notes that it is in the Coffeys' interest to concede that this multiple is appropriate, as the higher the multiple, the higher the value of the company and the lower the damages.

Based upon the above formula and factors, and using the *actual cash flow* for 1985, Mr. Millon determined that the value of the business was $2,288,167 in 1985. This court finds that figure to be true and correct. Accordingly, the debtor is entitled to $2,711,833 in damages which represents the difference between the $5 million purchase price and the actual value of the business in 1985.

## DISCUSSION

The debtor and the Coffeys differ markedly about the scope of the proceedings before this court. The Coffeys raise several procedural arguments concerning the type of proceeding (i.e. estimation hearing versus trial on the adversary complaint). In addition, the Coffeys urge a rather strict interpretation of Judge Fullam's opinion as to what matters are open for decision on remand. As to the merits, the Coffeys contend that no fraud was committed because the debtor should not have relied on the inaccurate information.

## PROCEDURAL ISSUES

*Trial on the merits versus estimation hearing*

The Coffeys contend that this court improperly conducted a trial on the merits instead of an estimation hearing which was required by Judge Fullam's opinion. To the contrary, Judge Fullam directed that: "the adversary proceeding will be tried on the merits, or such other procedure as the bankruptcy court deems necessary." Thus it is abundantly clear that trial on the adversary complaint is warranted and fully sanctioned by Judge Fullam. Furthermore, this court held that under the applicable provisions of the bankruptcy code, the estimation hearing was "subsumed within the trial."

11 U.S.C. § 502(c)(1) which provides the authority for estimating a claim states in relevant part:

There shall be estimated for purpose of allowance under this section—

(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case . . .

11 U.S.C. § 502(c)(1).

Neither the bankruptcy code nor the federal rules of bankruptcy procedure provide procedures or guidelines for estimation. The Third Circuit, however, has ruled that bankruptcy judges may use whatever method is best suited to the particular contingencies at issue, *Bittner v. Borne Chemical Co.,* 691 F.2d 134, 135 (3d Cir.1982); provided that the procedure is consistent with the policy underlying Chapter 11, that a "reorganization must be accomplished quickly and efficiently." *Id.* at 137. The court is of course bound by the legal rules which may govern the ultimate value of the claim . . . However, there are no other limitations on the court's authority to evaluate the claim save those general principles which should inform all decisions made pursuant to the Code. In reviewing the method by which a bankruptcy court has ascertained the value

of a claim under section 502(c)(1), an appellate court may only reverse if the bankruptcy court has abused its discretion. *Id.* at 136 (internal citations and footnotes omitted).

■ Where there is both an adversary proceeding and an estimation hearing before the court concerning the same issue: "[t]he bankruptcy court ha[d] exclusive jurisdiction to direct the manner and the time in which such a claim is to be liquidated or estimated as to its amount, and its decision should be subject to review only on the ground of abuse of discretion." *Bittner v. Borne*, 691 F.2d 134, 138 (3d Cir.1982). The Third Circuit rejected an argument by stockholder that the bankruptcy court erred because: "instead of estimating their claims in this manner, the bankruptcy court assessed the ultimate merits and, believing that they could not establish their case by a preponderance of the evidence, valued the claims at zero." *Id.* at 135. The Circuit panel found that: [a]ssuming, however, that the bankruptcy court did estimate their claims according to their ultimate merits rather than the present value of the probability that they would succeed in their state court action, we cannot find that such a valuation method is an abuse of the discretion conferred by section 502(c)(1). *Id.* at 138.

The facts of this case are even stronger than *Bittner v. Borne*. In this case, there was an adversary proceeding pending to determine the ultimate value of the claim. Second, there was an opinion issued by Judge Fullam specifically directing this court to conduct a trial on the merits. In addition, there were several case management orders and telephone conferences which discussed the methodology of trial. Thus there can be no complaints of due process violations due to lack of notice.

Finally, as indicated *supra*, from the standpoint of judicial economy as well as costs to the parties, the Coffeys' position makes no sense. Since it is clear from the statute that the purpose of estimation is to determine the value of the clam 11 U.S.C § 502(c)(1), and the purpose of the trial on the adversary proceeding as to determine the value of the same claim (*see adversary complaint*) it would be a useless exercise to conduct hearings and trials on both proceedings.

### 1. Law of the Case Analysis:

■ Law of the case doctrine provides that a court should not re-examine an issue already decided in the same case. This principle only applies to issues that were actually discussed by the court in the prior appeal and to issues decided by necessary implication. *Bridge v. United States Parole Commission*, 981 F.2d 97, 103 (3d Cir.1992) (quoting Todd & Co., Inc. v. SEC, 637 F.2d 154, 157 (3d Cir.1980)). Thus, it is clear that while this court is bound by the dictates of Judge Fullam's remand, it is free as to all other issues not decided by the District Court. *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 532 (7th Cir.1982), *rev'd on other grounds*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). A careful reading of the court's opinion is necessary to determine what issues were actually decided in order to define what is the "law" of the case. *Id.* at 533. The law of the case doctrine does not apply to dicta. *In re Philadelphia Litigation*, 158 F.3d 711, 718 (3d Cir.1998) Thus, dicta does not constitute binding determinations.

This court agrees that Judge Fullam issued a binding holding which is law of the case, that the debtors could not have a credit for indebtedness, nor could the debtors deduct from the Coffeys claim any tax savings. *Fullam Op.* p. 11. Thus, this court finds that the debtor is not entitled to the set-off allowed for the payments of the assumed indebtedness in the amount of $1.213 million. In addition, the debtor is not allowed a credit for the tax savings side agreement in the amount of $236,-566.22.

It is clear that Judge Fullam did not make any findings on the issues of fraud and value. There were, however, instanc-

es where Judge Fullam expressed concern with the sufficiency of the evidence set forth in the original opinion concerning fraud. Judge Fullam specifically stated that there was "[an] absence of evidence of a causal relationship between the alleged fraudulent misrepresentations and inaccurate financial records, on the one hand, and damages to the debtor on the other." *Id.* p. 9. This court interprets such language to be an expression of the area in which Judge Fullam would have liked to have seen more evidence. Nowhere his opinion does Judge Fullam state unequivocally that there was no fraud. He only expressed dissatisfaction with this court's discussion of the evidence concerning fraud: "[o]n this record, the evidence is insufficient to establish the amount of damages attributable to the Coffey's misrepresentation." *Fullam Op.* p. 11. Furthermore, Judge Fullam directed this court to conduct a *trial on the merits* with the existing record together with such additional evidence as the parties may present. *Id.* p. 12. Finally, Judge Fullam directed this court to "reconsider and reestablish an estimated value of the Coffeys' claim." *Id.* p. 12.

The Coffeys also seek to strain observations and commentary on the part of Judge Fullam into holdings and factual findings. In particular, the Coffeys point to the following observations:

*CPA Status vs. Presence of Tax Attorney:*

Judge Fullam states that this court seems to give undue weight to the senior Coffey's CPA qualifications while overlooking the fact that Mr. Moore himself was represented by a tax attorney. *Fullam Op. p. 11.* Accordingly, Judge Fullam directed this court to re-examine the issue of causation, and in so doing give consideration to the holdings of the Eastern Kentucky District Court and the Sixth Circuit Court of Appeals. The Sixth Circuit was confronted with this issue in the earlier case and explicitly rejected this line of reasoning. 992 F.2d at 1447. The Sixth

Circuit found that if the Coffeys' misrepresentations on the financial statements were such that they could not have been discovered through ordinary diligence, and Mr. Moore relied on those financial statements to his detriment, then an action for fraud could be maintained notwithstanding the presence of these experts. *Id.* On this issue, this court defers to the findings of the Sixth Circuit and Judge Fullam's directive to fully consider the findings of the Eastern Kentucky District Court and the Sixth Circuit Court of Appeals. In addition, as is discussed *infra*, this court is persuaded that Mr. Moore reasonably relied upon the financial statements by the totality of circumstances, and not only upon Mr. Coffey's qualifications as an accountant.

*Timely Filed Fraud Complaint:*

The Coffeys contend that Judge Fullam ruled that the debtor's fraud complaint was not timely filed. The Coffeys are confusing the timeliness of the debtor's complaint with that of Thomas Moore, *individually*. Following the instructions of Judge Fullam this court reviewed the Sixth Circuit opinion. The Sixth Circuit held that the debtor's claim was timely filed. The circuit court stated that Mr. Moore, *individually*, could not "piggyback" on *debtor's timely filed fraud claim. Id.* at 1443-44 (emphasis added). In addressing Mr. Moore's individual claim, the Circuit Court clearly stated that the debtor had a timely claim. Since the current proceedings concern the *debtor's* fraud claim, the timeliness of the claim is not an issue.

*Increase in Value from $300,000 to $2.5 Million:*

The Coffeys contend that Judge Fullam ruled that damages can be no more than $300,000. Judge Fullam specifically noted that Mr. Moore and the debtor asserted that the corporation's assets were overvalued by some $300,000, but in bankruptcy, this figure escalated to more than $2.5 million. These figures however, are directly related to the finding of the cause of

damages. The Coffeys claim that Judge Fullam's observations in remanding these matters are, either law of the case and not for trial or mandate a factual finding in favor of the Coffeys. However, Judge Fullam stated in his opinion that "[there was an] absence of evidence of a causal relationship between the alleged fraudulent misrepresentations and inaccurate financial records, on the one hand and damage to the debtor on the other." *Fullam Op. p. 9.* As discussed above, these were not holdings by Judge Fullam but rather, directions by Judge Fullam as to where this court needed to make additional findings of fact. If Judge Fullam had chosen to make a factual determination on these issues, he would have entered a final order specifying damages and not specifically remanded them to this court for further evidentiary findings.

*Millon Affidavit:*

In their brief, the Coffeys assert that Judge Fullam found that "Mr. Millon's analysis was worthless as a means of measuring damages." *Reply Memorandum of Creditors p. 1.* However, Judge Fullam made no specific references to any mathematical calculations, expenses, discount rate or other figures used by Mr. Millon. Judge Fullam objected to Mr. Millon's use of projections in reaching his findings, stating that "[Mr. Millon] based his opinion upon hypothetical cash-flow projections bearing little or no relationship to the actual facts pertaining to this particular business." *Fullam Op. p. 10.* While the use of projections in the discounted cash flow methodology is the most widely used and correct methodology in the appraisal of closely held businesses, as discussed *supra*, this court will utilize the multiple of cash flow methodology which relies upon more historical data, specifically multiples of *actual cash flow.*

## THE MERITS

### Fraud Claim

██ "Under Kentucky law, which governs this diversity action, the party asserting the fraud has the burden of establishing, by clear and convincing evidence, the following six elements: (1) a material misrepresentation; (2) which is false; (3) which was known to be false, or made recklessly; (4) made with inducement to be acted upon; (5) which is acted upon in reliance thereon; and (6) causes injury." 992 F.2d at 1447 (citing *Compressed Gas Corp. v. United States Steel Corp.*, 857 F.2d 346, 349–50 (6th Cir.1988)), cert. denied, 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 156 (1989) (citing *Wahba v. Don Corlett Motors, Inc.*, 573 S.W.2d 357, 359 (Ky.Ct.App.1978)).

Judge Forester and the Sixth Circuit, as well as this court (*see supra* p. 301), and Judge Fullam all found that the Coffeys made material misrepresentations in the financial statements which were false. Thus the first two criteria are met. Mr. Coffey testified that he had access to all of the correct information prior to the closing date (*see supra* pp. 301–02). Based upon the testimony and Mr. Coffey's demeanor and responses to certain questions on cross-examination, this court finds that Mr. Coffey had the skills and resources to know that the statements were false and actually did know that the statements were false. Thus this court finds that the third criteria was met. In addition, based upon the evidence and the testimony, this court finds that Mr. Coffey intended the debtor to rely on the fraudulent information. Mr. Coffey knew that in order to obtain a $5 million purchase price, the financials had to show over $500,000 in cash flow. Mr. Coffey himself testified that he told Mr. Moore that cash flow was in excess of $500,000. In addition, he prepared the financial statements, through various misrepresentations, inflation of assets and undervaluation of costs, so that it would show the cash flow which Mr. Moore required. Thus the fourth criteria is satisfied. Judge Fullam did not express concern about this court's original findings on the above criteria. Rather Judge Fullam addressed himself to the last two criteria

which will be discussed more at length below.

*Causation and Reliance*

■ Judge Fullam held that the "ultimate issue is whether the Coffeys, through fraud ... were selling a business for $5 million when they knew it was worth less than half that much (as the bankruptcy court's findings imply)." *Fullam Op.* at 8. Subsumed within this ultimate issue is a subsidiary issue whether debtor's reliance on the misrepresentations was the cause of the injury, *Fullam Op.* at 9.

Quoting the Sixth Circuit opinion in this case, 992 F.2d 1439, 1447, n. 7, Judge Fullam articulated the legal standard which this court is to use in determining reliance:

Under Kentucky law, Moore must show that his reliance on the misrepresentation was the cause of the injury. *Compressed Gas*, 857 F.2d at 352.

*Fullam Op.* at p. 9.

In the recitation of the facts, Judge Fullam noted: "Although the senior Coffey is a CPA, his son, who was the active manager of the business, is not. The bankruptcy judge seems to have given undue weight to the senior Coffey's CPA qualifications, while overlooking the undisputed fact that Mr. Moore himself was decidedly conversant with accounting matters and was represented by a tax attorney." *Fullam Op.* at p. 8.

The Sixth Circuit was confronted with this exact issue and provided some guidelines as to how the court should evaluate reliance. The Circuit Court stated that the Coffeys adopted the position of the District Court that "Moore has failed to carry his burden of proof on fraudulent inducement because (1) Moore and his attorney were an integral part of all negotia-

tions and meeting leading up to the sale on December 31, 1985; (2) Moore was advised by his attorney and other attorneys specializing in tax matters regarding this proposed sale ..." 992 F.2d at 1447. In reversing Judge Forester, the Circuit Court continued:

It is well established under Kentucky law that "equity will grant no relief to a complaining party who has means of knowledge of the truth or falsity of representations ..." *McClure v. Young*, 396 S.W.2d 48 (Ky.1965) ... If the means of knowledge of the alleged fraud were equally open to both parties, the law will not interfere to protect the negligent ... If the truth or falsehood of the representation might have been tested by ordinary diligence and attention, it is the party's own folly if he neglected to do so and he is remediless.

992 F.2d at 1447.

In this case, this court is in the unusual, but very fortunate position to have a published opinion of the Sixth Circuit which not only addresses the arguments presented by the Coffeys but also specifically instructs the trial court how to determine whether the debtor detrimentally relied on the Coffeys' misrepresentations:

There is an unresolved material issue of fact as to whether Moore could have discovered the overstatement through ordinary diligence and attention ... Even assuming he could not, it would still be the province of a jury to determine whether Moore detrimentally relied on this $300,000 overstatement[14] in signing the guaranty and consummating the deal.

\* \* \*

If the overstatement of the assets played a significant role in Moore's deci-

---

14. The Coffeys argue that this court is unable to find that the misrepresentations amounted to more than $300,000 because that is what was argued before the District Court in Kentucky and the Sixth Circuit. This court disagrees, however, because those proceedings involved merely a *motion for summary judg-* *ment,* and not a trial on the merits with full discovery, fact finding and testimony of the experts. In addition, it appears that the Sixth Circuit rounded off the $330,000 overvaluation, as testified by Dudley Shyrock, thus indicating that it was not intending to issue a binding determination.

sion to sign the guaranty, or if it contributed in any way to Moore and MOT's decision to purchase the business, or if it contributed to MOT's bankruptcy, such that Moore is now obligated on a five million dollar note, then clearly Moore suffered an injury.

*Id.*

In the original trial, this court found that:

> Moore and his representatives made his position absolutely clear to Coffey from beginning to end, and Moore clearly had every right to rely on the word of a Certified Public Accountant making written representations in a field in which the one making the representations indicated appropriate expertise. This Court finds as a matter of fact, that the reliance of the debtor and Mr. Moore on the representations of L. Coleman Coffey was reasonable reliance.

*Gindin Op.* at 22.

On remand this court finds that Moore could not have discovered the overstatement through "ordinary diligence and attention." Even though the transaction was accomplished in very short time frame, Mr. Moore prudently engaged an accountant to verify the cash flow and existence of the assets. In addition, Mr. Moore insisted upon extensive warranties that the financial information was true, accurate, and complete in accordance with GAAP. Mr. Moore's accountant, Mr. Rolfes, met with Mr. Smith, a partner at Mr. Coffey's accounting firm and was given the September 30, 1985 financial statements, a profit and loss statement and other documents which were represented to be prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). *Gindin Op. at* 11. Based upon those documents Mr. Rolfes concluded that the business had a cash flow of $580,000 which would support a $5,000,000 purchase price. *Id.* Moreover, every accountant that reviewed the unaudited November 30, 1985 financial statements testified that the indicated cash flow was in excess of $580,000, based upon the fraudulent information provided. As noted by the Coffey's own expert, James Graves, "[i]n all cases, we have relied upon the referenced information ... The report is, therefore, dependent upon the information provided. A material change in critical information relied upon in this report would be cause for reassessment." Thus, it is clear to this court from the testimony of the experts, including the Coffey's own expert, that a financial analysis is only as good as the information supplied. (*See also Valuing a Business*, the "model is only as good as the inputs to it. The relevant question is ... how correct was the input data." *Id.* at 51). In this case, the information supplied was fraudulent, thus any professional studying the doctored books would arrive at the same value for cash flow and would be unable to determine that the cash flow actually was much lower. This is the essence of accounting fraud. As stated earlier, the financials are the primary tool which a professional uses to determine value and cash flow. Thus even where a party takes pains to engage professionals to study the financials, the resulting opinion will be overinflated and cause the purchaser to pay too much.

In addition, the financials and other documents were prepared by and delivered at the offices of an accounting firm by an accountant other than Mr. Coffey. (Mr. Smith delivered the financials to Mr. Rolfes). While it may have been more prudent to insist upon audited financials, Mr. Moore's reliance upon the financials nevertheless were reasonable in light of the extensive warranties and the circumstances of the preparation and delivery of the documents. It is not simply the fact that Mr. Coffey is an accountant that persuades this court that reliance was reasonable. Rather it is the totality of the actions: (1) the fact that Mr. Moore engaged a CPA to determine value, (2) the fact that the CPA examined the standard documents relied upon in the industry to deter-

mine value, (3) the fact that Mr. Moore insisted on onerous warranties, (4) the fact that the documents were prepared by an accountant and delivered by a separate accountant other than the seller at the office of an accounting firm, and (5) the fact that every CPA that testified found that the financials documented cash flow above $550,000.

Such reliance caused debtor's injuries. Mr. Moore relied on his accountant's determination of cash flow based upon the financial statements, in going forward with the closing. *See Tr. of Testimony of Thomas Moore, Nov. 18, 1992; Affidavit of Thomas Moore, March, 1996.* As indicated above, Mr. Moore testified and proved that the financials had to show a cash flow in excess of $500,000 in order to service the debt associated with a $5,000,000 purchase price and operate the business. Thus this court finds that "the overstatement of the assets played a significant role in Moore's decision to sign the guaranty," 992 F.2d at 1447; and directly "contributed ... to Moore and MOT's decision to purchase the business." *Id.*

## SUBSIDIARY ISSUES

Both the debtor and the Coffeys have raised subsidiary issues which warrant brief mention here.

■ The debtor asks for punitive damages and attorneys fees pursuant to Kentucky law KRS 411.186 due to the egregious nature of the misrepresentations as well as the aggressive litigation tactics of the Coffeys. The court notes that both parties are at fault in the protracted nature of the litigation. Accordingly, the court declines to exercise its discretion to award punitive damages. *See Hanson v. American National Bank,* 865 S.W.2d 302 (Ky.1993); *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). The debtor has already received its remedy in damages for common law fraud under Kentucky law. *See supra* pp. 306 – 07.

■ The Coffeys have requested pre-petition interest, compounded annually. While Kentucky law generally allows prejudgment interest upon liquidated claims, (*State Farm Mut. v. Reeder,* 763 S.W.2d 116 (Ky.1988)), the fraud and misrepresentation damages convert the claim into an unliquidated claim, for which interest is allowed only in the discretion of the court. (*Brown v. Fulton, Hubbard & Hubbard* 817 S.W.2d 899 (Ky.App.1991)). Such a determination is based upon equitable grounds and may not be disturbed on appeal absent abuse of discretion. *Church and Mullins Corp. v. Bethlehem Minerals Co.,* 887 S.W.2d 321 (Ky.1992). This court declines to exercise its discretion to award pre-judgment interest to the Coffeys in light of their reprehensible conduct in committing numerous fraudulent misrepresentations.

The Coffeys also seek to preclude recovery by the debtor on the grounds that the debtor "sold" the marina/houseboat business for more than the $5,000,000 purchase price. However, after reviewing the evidence, in particular the affidavit of Mr. Rolfes, this court finds that the disposition of the marina/houseboat business was not a sale at fair market value, but rather a corporate reorganization for tax purposes, in which the transferee had the same shareholders as LCSDI. *See Affidavits of James P. Rolfes dated 1/16/96 and 10/20/93.* Accordingly, the Coffeys' position has no merit.

■ Finally, the Coffeys argue that the Court must "present value" the $5 million purchase price and then subtract the present value of the damages sustained by the debtor from the false representations. This would reduce the damages and increase the amount which the Coffeys could collect from the debtor. Aside from the fact that the Coffeys have failed to provide relevant case law to support this novel theory, this court rejects the notion because it results in double-dipping on the part of the Coffeys. The Coffeys insist

that the full $5 million is due and owing to them, but ask the court to "present value" the $5 million to $3.8 million when it applies to the debtor's damages. Not only is this unwarranted under existing law, but it is an inequitable result. Accordingly, the court declines to calculate damages in the manner suggested by the Coffeys.

### CONCLUSION

For all of the above reasons, this court finds that the Coffeys committed fraud under Kentucky law in connection with the purchase of the marina/houseboat business by submitting fraudulent financial statements which contained numerous misrepresentations. The debtor and Mr. Moore's detrimentally relied upon such misrepresentations and such reliance was reasonable. Since the debtor has not elected to rescind the contract, it is entitled to the difference between the $5 million purchase price and the actual value of the business in 1985 in damages. This court found that the business was worth $2,288,167 in 1985, thus the debtor is entitled to a set-off of $2,711,833. Accordingly, the debtor owes the Coffeys $2,288,167 less the payments of $1,000,000 [15] which were already made under the $5 million note for a balance due of $1,288,167. The debtor is instructed to submit an order consistent with this opinion within 10 days.

---

**15.** The following payments were made on account of the $5 million note: Payment 12/31/85: $200,000.00, Payment 3/15/86: $300,000.00; Payment 3/31/86: $500,000.00. *See Gindin Opinion,* p. 29.